**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CDX LIQUIDATING TRUST by the<br>CDX LIQUIDATING TRUSTEE,**<br><br>    **Plaintiff,**<br><br>    **v.**<br><br>**VENROCK ASSOCIATES,<br>VENROCK ASSOCIATES II, L.P.,<br>VENROCK ENTREPRENEURS FUND L.P.<br>HAMBRECHT & QUIST<br>CALIFORNIA, H&Q EMPLOYEE<br>VENTURE FUND 2000, L.P, ACCESS<br>TECHNOLOGY PARTNERS, L.P., ACCESS<br>TECHNOLOGY PARTNERS BROKERS<br>FUND, L.P., H&Q CADANT INVESTORS,<br>L.P.,  CHASE EQUITY ASSOCIATES,<br>L.L.C., J.P. MORGAN PARTNERS (BHCA),<br>L.L.C., ERIC COPELAND, C.H.<br>RANDOLPH  LYON, STEPHAN<br>OPPENHEIMER, and<br>CHARLES WALKER,**<br><br>    **Defendants.** | **Case No. 04 C 7236**<br><br>**Magistrate Judge Morton Denlow** |

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on six motions *in limine* filed by Plaintiff CDX Liquidating Trust by the CDX Liquidating Trustee ("Plaintiff" or "CDX" or "Trustee") and on eleven motions *in limine* filed by Venrock Associates ("Defendants" or "Venrock, et al."). In its sixth motion *in limine,* Plaintiff seeks to exclude the expert testimony of Gregory A.  Kyle. In its eleventh motion *in limine*, Defendants seek to prevent Plaintiff's proffered expert, M. Todd Henderson, from testifying at trial. Both motions *in limine* are the subject of this memorandum opinion and order.

These motions were referred by District Court Judge Charles R. Norgle, Sr. for resolution pursuant to 28 U.S.C. § 636(b)(1). This Court held oral argument on June 24 and 29, 2009.

## I. BACKGROUND FACTS

The factual and procedural history of this case is complex. Therefore, for purposes of this opinion, this Court sets forth only those details necessary to decide the motions presently pending before the Court.

CDX, formerly known as Cadant, filed this lawsuit on June 16, 2004.[1] This case originated in bankruptcy court. Cadant filed for bankruptcy in the U.S. Bankruptcy Court for the Northern District of Illinois on June 17, 2002. Upon filing of the bankruptcy petition, all of Cadant's alleged derivative claims became part of the estate. In this lawsuit, CDX alleges: (1) from January 2000 through May 2001, all or most of the Defendants spurned legitimate third-party financing in order to engage in self-dealing bridge loans on terms highly unfavorable to Plaintiff; (2) the rejection of the third-party financing offers was predicated on continued assurances from certain Defendants they would support the company with fair and equitable financing; and (3) subsequent to gaining control through bridge loans, Defendants sold the company to Arris Group, Inc. ("Arris"), with Defendants—not shareholders—recovering funds through the sale.[2] Dkt. 17.

---

[1]2  For purposes of this motion, this Court relies upon the facts as set forth in Judge Guzman's Aug. 8, 2005 Memorandum and Order, as well as parties' briefs. Judge Guzman's Aug. 8, 2005, Memorandum and Order is Dkt. 17. Plaintiff's memorandum in support of its motion *in limine* is Dkt. 122-123. Defendants' motion *in limine* is Dkt. 125-126.

[2] Dkt. _____ refers to docket entries in this case.

Former Defendant Venture Law Group was the debtor's general counsel. The remaining individual Defendants provided financing to the debtor. The Trustee alleges Defendants schemed to enrich themselves at the expense of the debtor and that Defendants' actions caused the debtor to take several short-term loans on terms ensuring it would default. From this default, the lender and board member Defendants would obtain the debtor's assets. Based on those allegations, the Trustee asserts claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duties, negligence, fraud, conspiracy, and equitable subordination.

In June 2002, following the company's sale to Arris, CDX filed a petition under Chapter 11 of the Federal Bankruptcy Code. In the United States Bankruptcy Court for the Northern District of Illinois, Bankruptcy Judge Eugene R. Wedoff approved a reorganization plan and closed all bankruptcy proceedings related to CDX on November 1, 2004. The plan included provisions for the commencement of this action.

The complaint initially listed sixteen causes of action. Defendants moved to strike the entire complaint pursuant to Federal Rule of Bankruptcy Procedure 7012(b)(6). The motion was granted in part, but denied with respect to Plaintiff's claims for breach of fiduciary duty, aiding and abetting breaches of fiduciary duty, civil conspiracy to breach fiduciary duties, and equitable subordination. Defendants filed a motion to withdraw the reference to the bankruptcy court before District Judge Ronald A. Guzman. On August 10, 2005, Judge Guzman issued a memorandum opinion and order denying Defendants' motion. Judge Guzman found, *inter alia*, that (1) although certain Defendants had waived their right to a jury trial by filing proofs of claim, they were entitled to rely on the Trustee's jury demand; (2) given Defendants' repeated refusal to consent to a jury trial in the bankruptcy court, any trial in this case must take

place in the district court; (3) although a withdrawal of reference was not appropriate at that time, the court would reconsider the matter when the case was ready for trial; and (4) the bankruptcy judge should preside over all pre-trial matters through the close of discovery.

In October 2006, Plaintiff filed a motion to withdraw reference. On February 12, 2007, Judge Guzman recused himself. The case was reassigned to Judge Mark Filip, who struck the Plaintiff's motion without prejudice. Dkts. 33-34. On March 9, 2007, Judge Filip reinstated the case, deemed the Plaintiff's motion filed instanter, and ordered the parties stand on previously filed briefs. Dkt. 38. On May 23, 2007, Judge Filip recused himself. Dkt. 43. The case was reassigned to Judge Norgle. Dkt. 33. This case is set for trial before Judge Norgle in Februrary 2010. *See* Dkt. 145. The case was referred to this Court in accordance with Local Rule 72.1. Dkt. 73.

## II. LEGAL STANDARDS

This Court will discuss the applicable motion *in limine* and *Daubert* legal standards, and will then apply them to the two motions *in limine*.

### A.    Motions *in Limine*

A motion *in limine* is a request for the court's guidance concerning an evidentiary question. *Wilson v. Williams*, 182 F.3d 562, 570 (7th Cir. 1999); *Kiswani v. Phoenix Security Agency, Inc.*, 247 F.R.D. 554, 557 (N.D. Ill. 2008). The Court may give such guidance by issuing a preliminary ruling regarding admissibility. *Wilson,* 182 F.3d at 570-71. Trial judges are authorized to rule on motions *in limine* pursuant to their authority to manage trials, even though such rulings are not explicitly authorized by the Federal Rules of Evidence. *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984). While judges have broad discretion when ruling on

motions *in limine*, evidence may be excluded only when it is inadmissible on all potential grounds. *Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002)*; Townsend v. Benya*, 287 F. Supp. 2d 868, 872 (N.D. Ill. 2003). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Hawthorne Partners v. AT&T Techs., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993). Thus, the party moving to exclude evidence *in limine* has the burden of establishing the evidence is not admissible for any purpose. *Robenhorst v. Dematic Corp.*, 2008 WL 1821519, at *3 (N.D. Ill. April 22, 2008).

Denial of a motion *in limine* does not mean all evidence contemplated by the motion will be admitted at trial. *Hawthorne*, 831 F. Supp. at 1401. Rather, denial means the court cannot determine whether the evidence in question should be excluded outside of the trial context. *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989). A ruling is not necessarily final. *Townsend*, 287 F. Supp. 2d at 872. "The ruling is subject to change when the case unfolds," particularly if the actual testimony differs from what was proffered. *Luce,* 469 U.S. at 41. "Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Id.* at 41-42.

## B.     Admissibility of Expert Testimony

The legal standard for the admission of expert testimony is well-established. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court stated a district court has a "gatekeeping role" of ensuring an expert's testimony is both reliable and relevant. 509 U.S. 579, 597 (1993). In the Seventh Circuit, the principles set forth in *Daubert* and Rule 702 of the

Federal Rules of Evidence ("Rule 702") govern the admission of expert testimony, which must satisfy the following standard:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Preliminary questions concerning the qualifications of an expert witness or the admissibility of evidence are determined by the court. Fed. R. Evid. 104(a).

In applying Rule 702, courts undertake a three-step analysis: the witness must be qualified "as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702; the expert's reasoning or methodology must be scientifically reliable, *Daubert*, 509 U.S. at 592-93; and the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702; *Ervin*, 492 F.3d at 904. The party that proffers an expert's testimony bears the burden, by a preponderance of the evidence, of establishing its admissibility. *Dukes v. Illinois Cent. R. Co.*, 934 F. Supp. 939, 946 (N.D. Ill. 1996). "The focus of the district court's *Daubert* inquiry must be solely on principles and methodology, not on the conclusions they generate." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 742 (7th Cir. 2007).

*Daubert* sets forth the following non-exhaustive list of guideposts to determine reliability: (1) whether the proffered theory can be and has been tested; (2) whether the theory

has been subjected to peer review and publication; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community. *Ervin*, 492 F.3d at 904; *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869 (7th Cir. 2001). "[A] court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005). The inquiry envisioned by Rule 702 is a flexible one. *Daubert*, 509 U.S. at 594; *Winters*, 498 F.3d at 742.

## III. DISCUSSION

**A.     Plaintiff's Motion *in Limine* Number 6—Motion Pursuant to *Daubert* to Exclude the Expert Testimony of Gregory A. Kyle.**

Plaintiff seeks to preclude Defendants' expert, Gregory A. Kyle ("Kyle"), from testifying. Defendants proffer Kyle as an expert on the internet infrastructure market to opine on four areas: (1) the risk factors for CDX's investors compared to investors in other high-tech companies; (2) the state of the public equity and capital markets in 1999 through 2001 and the markets' effect on CDX's ability to raise financing; (3) the state of the public equity markets in terms of mergers and acquisitions and initial public offering ("IPO") valuations and their relation to CDX; and (4) comments on an alleged statement by one of Plaintiff's experts, Dr. Scott Hakala ("Hakala"), regarding the impact of September 11th on the markets.

Defendants argue: (1) Kyle's testimony regarding the dot-come bubble's effect on CDX's financing options is reliable, as his nearly thirty years of academic, technical and practical experience analyzing capital markets and financing activities of individual technology companies qualifies him to testify about capital and equity market trends and their impact on

technology companies; (2) Kyle is qualified to testify as an expert in analyzing the capital markets, not as an engineer; (3) whether Kyle is knowledgeable about subjects beyond the scope of his testimony is irrelevant (i.e. bridge loans, reasonableness of CDX's valuation, appropriateness of the risk disclosures, fairness opinions, and the principles of appraisal practice and code of ethics) because all such subjects are beyond the scope of his testimony; (4) Kyle's methodology is sound (Plaintiff does not directly challenge Kyle's methodology); (5) Kyle's disagreement with Plaintiff's position is not a basis for excluding his testimony; (6) Kyle's testimony goes directly to Plaintiff's claims Defendants prevented CDX from obtaining financing on "more favorable terms"; and (7) Hakala's testimony that September 11th did not impact the markets is appropriate for examination.

## 1. Kyle is Qualified to Give Expert Testimony.

Plaintiff claims Kyle's testimony is being offered to supplant the testimony of fact witnesses and documentary evidence, offering four specific arguments. First, Plaintiff argues Kyle is not qualified. For example, Plaintiff argues Kyle has no engineering degree and has never designed or manufactured internet infrastructure products; he has no post graduate education in economics or finance; he has no knowledge regarding bridge loans; he could not comment on the appropriateness of risk disclosures in CDX's private memoranda; and he has never issued a fairness opinion. Plaintiff admits Kyle may know how analysts research and report on public companies, but argues such expertise is irrelevant.

This Court finds Kyle is amply qualified to testify about capital and equity market trends and their impact on technology companies. *See, e.g.,* Kyle Rep., at 3-4; Kyle Dep. Tr., at

154:23-158:20. Kyle's opinions concern the state of the markets from 1999 to 2002, and the markets' effect on the ability of technology startup companies like Cadant to raise financing. *See* Kyle Rep., at 2; Kyle Dep. Tr., at 111:5-15; 112:19-113:3. Within that context, Kyle also opines on typical market risks that faced startups. Kyle Rep., at 2; Kyle Dep. Tr., at 111:20-112:1. With more than nineteen years of experience, Kyle is qualified to opine on these subjects. He has a special emphasis on technology and startup companies such as Cadant. He has reported on market trends for investment banks and market participants and has written extensively for institutional investors on emerging company valuations. With nearly thirty years of academic, technical and practical experience analyzing capital markets and the financing activities of technology companies, Kyle is qualified to render opinions on the issues at hand. Kyle is qualified to testify as an expert in analyzing the capital markets, not as an engineer. His lack of an engineering degree is irrelevant because he does not opine on the technological functionality of Cadant's products. Instead, Kyle will testify as to the state of the public equity and capital markets from 1999 to 2002, consistent with his range of experience.

### 2. Kyle's Opinions are Reliable and Relevant.

Second, Plaintiff argues, even if he were qualified to testify as an expert for some limited purpose, Kyle offers little more than unsupported speculation that fails to satisfy the *Daubert* standard. Specifically, Plaintiff contends Kyle's opinions are unreliable and irrelevant in two areas: (1) with respect to risk factor disclosures ("RFD"); and (2) and regarding the state of the equity markets and CDX's valuation. First, Kyle compared the RFD in CDX's private placement memoranda ("PPM") with the RFD in the offering materials of other internet

infrastructure and high-tech companies and found them to be quite similar. Plaintiff asserts Kyle's opinions regarding RFDs are unreliable and irrelevant because Kyle has no criticism of the accuracy of the risk disclosures and has no expertise regarding what must be contained in RFDs. Thus, Plaintiff claims he cannot opine regarding the specifics of the CDX disclosures. Plaintiff argues CDX's engineers, founders and directors, as well as the attorneys who prepared the disclosures, will testify and can explain the RFDs and PPMs to the jury. Second, with respect to the state of the equity markets and CDX's valuation, Plaintiff claims Kyle's testimony that "CDX was a victim of an unprecedented nuclear winter which doomed [its] ability to obtain financing similar to many other high-tech start-up companies [from the summer of 2001 through October 2002]" should be excluded because it would only confuse the jury and supplant the testimony of fact witnesses and documentary evidence.

As with the first issue, this Court finds Defendants again have the better argument. Whether Kyle is knowledgeable about subjects beyond the scope of his testimony is irrelevant because he does not intend to testify about bridge loans at trial; nor does he appear to opine about them in his report. Kyle Dep. Tr., at 171:24-172:19; 219:5-16. While Plaintiff argues Kyle is not qualified to offer opinion testimony concerning the reasonableness of Cadant's valuation both for acquisition and for IPO purposes, this is not the case. Instead, Kyle merely emphasizes any valuation for Cadant would be unreliable. *See* Kyle Dep. Tr., at 333:15-335:1; Kyle Rep., at 38-39. Thus, Kyle's opinions are reliable and relevant in the two areas targeted by Plaintiff: RFDs and the state of the equity markets and CDX's valuation.

Kyle is thus permitted to testify regarding those issues. For example, he may express his opinions about what risk factors were typical of startups during the dot-com bubble period, based on "hundreds of SEC filings." Kyle Rep., at 5-6; Kyle Dep. Tr., at 185:22-24, 188:12-16. Kyle also compared those typical risk factors with the ones outlined in Cadant's PPM and assessed the impact of Cadant's stated risk factors on its financial success. Kyle Rep., at 6-14; Kyle Dep. Tr., at 166:17-168:18; 186:2-187:9; 193:23-194:6. It is evident Kyle does not intend to testify about the "appropriateness" or "adequacy" of Cadant's risk disclosures. Kyle Dep. Tr., at 168:13-18; 189:19-190:2.

At this time, the Court also notes while Plaintiff does not directly challenge Kyle's methodology, Kyle's methodology is sound. For example, Kyle drew upon his considerable knowledge and experience analyzing the capital and equities markets; performed a complete analysis of economic factors influencing startup companies' abilities to raise capital during the relevant time period; and reviewed relevant research. Kyle Dep. Tr., at 126:7-127:1; 128:11-129:24; 134:4-135:13; 149:24-150:17; 176:8-178:4; 270:11-16; Kyle Rep., at 20-43.

Moreover, Kyle's testimony will not confuse the jury. To the contrary, there is ample reason to conclude his testimony will aid the jury in understanding this complicated case. *See, e.g., Securities and Exchange Commission v. Roszak*, 495 F. Supp. 2d 875, 881 (N.D. Ill. 2007) (financial economist was qualified to give expert testimony based on "significant experience and expertise in economics, insider trading, market behavior, the valuation of stocks, and the study of stock prices, as well as the factors and events that influence stock market behavior and prices"). To the extent Plaintiff disagrees with Kyle's positions (as is

always the case with experts), Plaintiff will be free to test his position, reasoning and conclusions on cross-examination.

### 3. Kyle's Testimony is Not Unscientific Speculation.

Third, Plaintiff argues Kyle's opinions regarding the "beliefs and thinkings of others" constitute inadmissible speculation. (Regarding Section 4.2 (beginning on page 21) through Conclusion Section of Kyle Rep.). According to Plaintiff, Kyle "engages in a series of speculations" regarding the reasonableness of CDX's valuation, which it contends are inadmissible for two reasons: (1) the testimony does not assist the jury because it repeats evidence it will learn independently from fact witnesses and has the ability to understand; and (2) the Court must determine whether the evidence is genuinely scientific as opposed to unscientific speculation because Kyle's training and experience as an analyst does not render his opinions reliable. Also, while Kyle opines regarding the reasonableness of CDX's valuation, Plaintiff emphasizes Kyle did not prepare such a valuation.

This Court concludes Kyle's testimony goes directly to Plaintiff's claims Defendants' conduct prevented it from securing financing on "more favorable terms." Expert testimony is relevant if it will "assist the trier of fact with its analysis on *any* of the issues." *Smith*, 215 F.3d at 718 (emphasis added). Expert testimony need not embrace the ultimate issue; rather, it "need only be relevant to evaluating a factual matter." *Id.* at 720.

Here, Kyle's testimony goes directly to the issue of the state of the public markets after the bursting of the tech bubble because it offers an alternative explanation for why Cadant could not obtain better financing. Kyle's explanation makes it less likely Plaintiff's explanation

is true and is therefore highly probative. Kyle does not intend to testify about the appropriateness or adequacy of Cadant's risk disclosures; if he seeks to do so during trial, the trial judge should bar such testimony. Kyle's specialized market knowledge allows him to comment on the typicality of Cadant's risk disclosures, and their likely impact on investors.

While Plaintiff contends Kyle's opinions are mere speculation, this Court disagrees. In fact, Kyle expressly rejected Plaintiff's repeated invitations to speculate during his deposition. *See, e.g.,* Kyle Dep. Tr., at 261:10-21; 286:2-288:5. Instead, Kyle offered reasoned inferences based upon economic data and contemporaneous opinions expressed by other analysts. By relying upon the work of other seasoned analysts, Kyle bolsters his opinions about the state of the markets during the relevant period.

**4.    Kyle's Testimony Regarding Post-September 11th Events is Proper.**

Fourth, and finally, Plaintiff argues Kyle's criticisms of the opinions of Plaintiff's expert Hakala related to post-September 11th events are irrelevant in the liability phase. Kyle Rep., at 29-30; Kyle Dep. Tr., at 321:17-323:15. Plaintiff believes Defendants' conduct in the liability phase will be judged using the "entire fairness standard" since Defendants allegedly caused CDX to accept short-term bridge financing with their own employers in 2001. Hakala analyzed the terms of the bridge loans and found they were unfair to CDX and its stockholders. Hakala Dep. Tr., at 300:1-13. Hakala indicated in his report he had not completed his damages analysis. Kyle criticizes Hakala's report for an alleged comment on the impact of September 11th on the economy and equity markets. Kyle Rep., at 29-30; Kyle Dep. Tr., at 113:4-7. Plaintiff argues this criticism is irrelevant to Defendants' liability because the fairness of bridge

loans must be judged at the time at which they were approved and closed (in January and May 2001, respectively). According to Plaintiff, the post-September 11th condition of the economy and markets is irrelevant to Hakala's testimony in the liability phase.

In response, Defendants contend Kyle properly confines the scope of his testimony to the scope of his expertise: the volatile state of the capital and equities markets from 1999 to 2002; and the markets' impact on the ability of startups like CDX to secure financing. Kyle stated he is not judging the credibility of fact witnesses and he was not asked to perform a valuation of CDX. Defendants claim none of Plaintiff's grounds to exclude Kyle's testimony regarding Hakala's opinion that September 11th did not affect the capital markets are valid.

This Court agrees with Defendants with respect to this final issue. At this time, it appears Hakala's testimony that the September 11th attacks did not impact the markets is appropriate for examination. Kyle addresses this testimony in his report. While the bridge loans predated September 11th, Defendants' other actions with which Plaintiff takes issue occurred well after September 11th. Such actions underlay Plaintiff's claims here. Also, Cadant's efforts to obtain financing during 2001 strike at the heart of this case; September 2001 marks a key period. As Defendants emphasize, a failed financing led by Comcast predated Cadant's acquisition by a mere matter of weeks. The impact of September 11th is thus a critical factor in assessing the availability of alternative financing during late 2001. Moreover, although this Court maintained the bifurcated approach to this trial such that damages will not be an issue in the first phase, the impact of September 11th goes directly to issues of liability. While the main focus of Hakala's expert may be Cadant's bridge loans, the main focus of his

statement about the impact of September 11th on the markets is just that—September 11th's impact on the markets.  It is thus highly relevant and appropriate for examination.

In sum, this Court denies Plaintiff's sixth motion *in limine*.  Kyle is permitted to testify as set forth in this opinion.

**B.    Defendant's Motion *in Limine* Number 11—Motion to Exclude Any Evidence, Testimony or Opinions from Plaintiff's Expert M.  Todd Henderson**.

**1.    Factual Background.**

Defendants seek to exclude the testimony of Plaintiff's expert witness on corporate governance, M. Todd Henderson ("Henderson").  Specifically, Defendants argue he is not qualified to serve as an expert, and further maintain he is not permitted to offer an opinion that embraces an ultimate issue to be decided by the trier of fact.  Plaintiff alleges fiduciary breaches by four individuals—Eric Copeland, C. H. Randolph Lyon, Stephan Oppenheimer, and Charles Walker—who served on Cadant's board of directors at different times, and for different durations.  Plaintiff seeks to hold these directors liable for decisions by the entire Cadant Board in 2000 and 2001 regarding third party indications of interest to finance or possibly acquire Cadant. Plaintiff also charges eight entity defendants with aiding and abetting the individual defendants' alleged fiduciary breaches, and asserts all Defendants conspired to cause those alleged breaches.  Specifically, Plaintiff challenges the Board's responses to: (1) an April 2000 letter from a third party regarding acquiring Cadant; (2) proposed term sheets from late 2000; and (3) bridge loans that saved Cadant from running out of cash.

The Defendant board members' fiduciary duties will be a key issue for the jury instructions. Because Cadant was incorporated in Maryland through December 2000, and in Delaware thereafter, the instructions will address both states' fiduciary duty standards for directors. Applying the legal standards, the jury will decide whether the individual defendants breached their fiduciary duties and whether the entity defendants aided and abetted those purported breaches. Henderson's proffered testimony addresses the fiduciary duty issue.

**2.    Analysis: Henderson's Opinions Regarding Fiduciary Duty Law Are Admissible as Set Forth Herein.**

Defendants argue Rules 403 and 702 preclude Henderson from testifying. They also contend case law bars his testimony, claiming courts consistently prevent experts from applying legal standards to the facts of a case and opining on whether Defendants' conduct breached or violated those standards, as such testimony invades the province of the jury. Specifically, Defendants claim Henderson should be stricken as an expert for attempting both to espouse the law and to apply it before the jury.

**a.    Rule 702 Does Not Bar Henderson's Testimony Because He Is a Qualified Expert in Fiduciary Duty Law and His Opinions Assist the Jury.**

Defendants argue while the prohibition on legal opinions is not conditional on the qualification of the purported expert, the danger of allowing Henderson to present such testimony to the jury is accentuated by his absence of expertise. Rule 702 requires an expert witness to be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. In its gatekeeping function, a trial court must determine an expert's opinion

is "informed by the witness's expertise," rather than "simply an opinion broached by a purported expert." *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996). Defendants claim Henderson cannot show he possesses particular experience, training, or education that distinguishes him from other lawyers and qualifies him to opine on the specific topic of board members' fiduciary duties under Delaware and Maryland law.

For example, Defendants point to Henderson's resumé to support their claim he is not qualified to testify about a board of directors' fiduciary obligations under Delaware and Maryland law. Defendants also maintain Henderson's status as a former appellate lawyer, or current occupation as a law professor, do not render him qualified. In sum, Defendants contend courts routinely exclude witnesses who are likewise armed only with general credentials and lack expertise in the specialized subject of the proffered testimony.

Defendants separate Henderson's proposed testimony and expert report into two parts: (1) explaining Maryland and Delaware fiduciary duty law; and (2) applying that law to the facts of this case in that he opines Defendants breached their fiduciary duties. While Plaintiff agrees Henderson cannot offer his opinion at trial regarding what he believes the law to be, it argues his testimony provides a useful framework within which the jury may view and decide the case and addresses a mixed question of law and fact, in that he permissibly opines about Defendants' conduct in light of industry standards in the special context of startup companies.

Expert testimony is relevant if it will "assist the trier of fact with its analysis on *any* of the issues." *Smith*, 215 F.3d at 718 (emphasis added). It need not embrace the ultimate issue; rather, it "need only be relevant to evaluating a factual matter." *Id.* at 720. Experts "cannot

17

testify about legal issues on which the judge will instruct the jury." *United States v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996); *In re Ocean Bank*, 481 F. Supp. 2d 892, 901 (N.D. Ill. 2007).

Testimony purporting to detail the controlling legal standards does not assist the jury because the judge instructs the jury on the law. Simply put, "in a trial there is only one legal expert—the judge." *Pivot Point Int'l, Inc. v. Charlene Prods. Inc.,* 932 F. Supp. 220, 225 (N.D. Ill. 1996); *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir.1997). Allowing experts to testify about their interpretations of the law would usurp the judge's role as law-giver, and "[i]t is not for witnesses to instruct the jury as to applicable principles of law, but the judge." *Panter v. Marshall Field & Co.*, 646 F.2d 271, 294 n.6 (7th Cir.1981).

Plaintiffs contend *Miksis v. Howard* in instructive. *See* 106 F.3d 754, 762 (7th Cir. 1997). In *Miksis*, the Seventh Circuit upheld the admission of testimony from an expert who opined the driver's sleep deprivation was the "primary cause" of the accident. *Id.* In so doing, the court relied upon Rule 704 to dismiss defendants' arguments that such testimony constituted an ultimate legal conclusion, noting there existed a factual dispute concerning the existence of fatigue; and finding the testimony about whether fatigue could have caused the driver to hit plaintiff's construction bucket addressed factual and not legal causation. *Id.*

For their part, Defendants rely upon cases such as *Landeen v. PhoneBILLit, Inc.*, 519 F. Supp. 2d 844 (S.D. Ind. 2007), in which a lawyer was excluded as an expert in a legal malpractice action because, even though the attorney "has considerable experience as a lawyer in the Indianapolis community, there is no specialized training, experience, or education in [his] background that would qualify him as an expert on matters of legal malpractice." *Id.* at

848. Defendants use this case to argue neither Henderson's abbreviated experience as an appellate and regulatory lawyer; nor his three-year sabbatical from the law; nor his foray into academia qualifies him to testify about the requirements of fiduciary duty law.

In *Bammerlin v. Navistar International Transportation Corp.*, 30 F.3d 898 (7th Cir. 1994), the Seventh Circuit explained that by improperly allowing an expert to testify about the applicable legal standards, the trial court had "left the jury adrift and permitted it to return a verdict on a basis that may have been legally and factually flawed." *Id.* at 901. The meaning of the governing law "is not a question of fact, to be resolved by the jury after a battle of experts. It is a question of law, to be resolved by the court." *Id.* at 900. Thus, under Rule 702, courts have consistently excluded experts who proffer testimony on the law governing the case.

Citing *Panter*, Defendants argue these principles have been applied by the Seventh Circuit to the very topics upon which Henderson seeks to opine: a board of directors' fiduciary obligations. In *Panter,* shareholders sued the board of directors alleging, among other things, that the board had breached its fiduciary duties when it rejected a potential acquirer's tender offer. *Panter*, 646 F.2d at 293-95. In support of that claim, plaintiffs "proffered expert testimony on the ordinary standards against which the actions of boards of directors and investment bankers would be measured." *Id.* at 294 n.6. The trial court excluded that expert testimony and entered a directed verdict for defendants on all claims. *Id.* On appeal, the Seventh Circuit affirmed the exclusion of plaintiffs' expert, explaining, "[i]t is not for witnesses to instruct the jury as to applicable principles of law, but the judge." *Id.* at 294. In defendants' view, plaintiff's proffered expert "would have been able to add nothing to the formulation of

the proper standards for evaluating the conduct of [defendant's] directors enunciated by the trial court." *Id.* Defendants contend this reasoning would also bar Henderson.

This Court disagrees. In sum, Henderson is qualified pursuant to Rule 702 to testify as an expert in the field of corporate governance, as he possesses sufficient training and experience in that he is a law professor; a specialist in the field of corporate law; a lawyer; a published author regarding a variety of corporate law topics; a former management consultant; and has had dealings with in excess of twenty separate boards of directors. Ex. C to Def. Memorandum, Henderson Rep., at 3-4. *See also* Dkt. 134 (Pl. Resp.), at 3; Ex. D to Def. Memorandum, Henderson Dep., at p. 67. For example, Henderson worked closely with boards of directors and committees of boards and made presentations regarding issues of business and regulatory strategy, corporate governance and other high-level management issues. Henderson Rep., at 4. He also was involved in the valuations of private entities and the analysis of valuation models for investors considering investing in private companies. Ex. D to Def. Memorandum, Henderson Dep., at p. 58. As a practicing lawyer, he was a member of the Maryland bar and, based upon his legal and academic experience, is thoroughly familiar with Delaware and other state and federal law on corporate governance, corporate finance and the proper conduct of directors and officers. Henderson Rep., at 4.

Henderson is not rendered unqualified to testify simply because he has never served on nor given legal advice to a board of any Delaware or Maryland company. While Defendants complain Henderson has never served on a board, nor acted as legal counsel providing legal advice to a Maryland or Delaware corporation, this does not merit the exclusion of his

testimony.  To the contrary, courts permit experts to testify in similar circumstances.  *See, e.g., Cary Oil Co. v. MG Refining & Marketing, Inc.,* 2003 WL 1878246, at *6 (S.D.N.Y. Apr. 11, 2003) (law professor deemed more than qualified to testify on issues of corporate governance and veil-piercing; moreover, the court held "there is no minimum amount of experience that a potential expert witness in corporate governance or any other field must reach in order to demonstrate sufficient ability to testify"); *Ferguson v. Lurie*, 1991 WL 235280, at *2 (N.D. Ill. Oct. 30, 1991) (professor deemed qualified as an expert despite failing to hold an appraiser's license and having limited practical experience as an appraiser because his academic achievement sufficed)*; Loeffel*, 387 F. Supp. 2d 794, 801 (N.D. Ill. 2005) (fact that witnesses were not CPAs and lacked experience in the steel industry or in cases dealing with lost profits due to faulty machinery did not disqualify them as experts); *Drebing*, 519 F. Supp. 2d 811, 816 (N.D. Ill. 2007) (court permitted expert testimony from a CPA who reviewed corporate records and financial documents and drew conclusions about corporate governance from them).

Pursuant to Rule 702, Henderson is amply qualified to serve as Plaintiff's expert on corporate governance.  Unlike the *Panter* expert, he offers enough testimony regarding general standards governing boards of directors such that he will be able to assist the jury in understanding the evidence and determining the facts in issue.

### b. Rule 403 Does Not Bar Henderson's Testimony Because His Opinions Will Not Mislead or Confuse the Jury.

Rule 403 bars expert testimony purporting to interpret the governing law, because such testimony will necessarily confuse the jury by providing competing interpretations of the law.

*Klaczak*, 2005 WL 1564981, at *9; Fed. R. Evid. 403. Rule 403 requires a court to evaluate whether relevance is substantially outweighed by "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Expert testimony about the governing law is barred under Rule 403 because "it would be a waste of time if witnesses or counsel should duplicate the judge's statement of the law, and it would intolerably confound the jury to have it stated differently." *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988) (holding, *en banc*, trial court erred in admitting expert testimony on the legality of warrantless searches, whether defendants had conducted a "search" and had received valid "consent," and whether the acts of a private individual could constitute "state action").

Accordingly, Henderson cannot testify about his interpretation of Delaware or Maryland fiduciary duty law. Given the "aura of trustworthiness and reliability" that often surrounds expert witnesses, expert testimony on how to interpret the law could override the judge's instructions to the jury, and multiple presentations of the law can create a significant potential for jury confusion. *Id.* at 809. Thus, expert testimony about the law governing a case can be more confusing than helpful to the jury. *See Sinclair*, 74 F.3d at 757-58. *Klaczak*, 2005 WL 1564981, at *9 (excluding expert testimony about federal statutes, reasoning it would "create an unacceptable risk on balance of jury confusion given their limited utility as offered in the form of expert testimony"). *See, e.g. Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997)

In sum, Henderson may testify at trial, within certain parameters. For example, he may provide a backdrop against which the jury may view this case in that he can describe how

boards operate; the types of alternatives available to the Cadant Board at all relevant times; and the factors a board can and should consider when making decisions. However, he cannot judge what Defendants did or did not do; nor whether they violated the law in that if he were to opine that (and to explain how) their conduct constituted a breach of fiduciary duty, he would necessarily be deeming Plaintiff's version of the facts to be the credible account, which is prohibited. After all, the issue of whether Defendants breached their duties is an issue for the trier of fact to decide. *Id.* It is not for Henderson to tell the trier of fact what to decide. *Id.*

      **c.**     **Henderson's Opinions Explaining Directors' Duties and How the Directors Acted in this Case are Admissible**.

Rule 704 does not allow expert opinions containing "legal conclusions," not because they involve an ultimate issue, but because they do not assist the trier of fact, and are not "otherwise admissible." *Richman v. Sheahan*, 415 F. Supp. 2d 929, 945 n. 15 (N.D. Ill. 2006). Rule 704 also provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704. It is generally thought that ultimate issues under Rule 704 must be factual, and not legal. *Richman,* at 944.

As the court explained in *Richman*, the focus of the Rule 704 inquiry should be on whether the testimony contains language that has a "separate, distinct, and specialized meaning in the law different from that present in the vernacular" or whether the words also have an everyday meaning. *Id.* at 947. The court explained:

> Even if the everyday understanding of a term and its legal
> meaning are congruent, exclusion is inappropriate where the

opinion will not consist of a naked conclusion (i.e., the defendant's conduct was reasonable, was negligent, etc.) but will be based on 'adequately explored legal criteria.' That is, they will explain the reasons underlying the ultimate conclusion. Moreover, the court will instruct the jury on the appropriate meaning of the legal standard and that the jury is free to reject the testimony of the expert. Consequently, the risk of jury confusion is not present. *Id. See also Amakua Development LLC v. Warner*, 2007 WL 2028186, at *11 (N.D. Ill. July 10, 2007); *In re Commercial Loan Corp.*, 396 B.R. 730, 739 (Bankr. N.D. Ill. 2008) (expert's use of the term "conduit" did not render his opinion a legal conclusion since the word has a common, non-legal meaning in addition to a technical, non-legal one).

*Id.*

Here, Henderson's testimony provides useful background information on industry standards, and does not constitute an impermissible legal conclusion as Defendants contend. His report and testimony offer his analysis of the practices and standards of corporate governance and a description of Defendants' conduct in light of those practices and standards. As discussed above, he does not merely offer naked conclusions, but instead offers opinions based upon adequately explained underlying reasons. *S.P.A.,* 2006 WL 293883, at *6 (N.D. Ill. Feb. 3, 2006); *Richman, supra* at 949. Henderson is permitted to testify regarding Defendants' conduct in the descriptive sense in terms of what Defendants did and did not do, but he cannot opine on whether Defendants' actions constituted a breach of their fiduciary duties, as such a question constitutes the ultimate issue for resolution by the trier of fact.

Defendants characterize Henderson's testimony as consisting of merely legal conclusions. This Court disagrees, finding he calls upon his training, education and practical experience as a basis upon which to provide a helpful explanation to the jury regarding the

standard practices and procedures of corporate governance.  Moreover, Henderson's testimony is consistent with testimony admitted in Seventh Circuit cases.  *See, e.g., Miksis*, 106 F.3d at 762.  Significantly, in *Richman v. Sheahan,* the court found "there is no doubt that under Rules 702 and 704, an expert may testify about applicable professional standards and the defendants' performance in light of those standards."  415 F.  Supp.  2d 929, 945 (N.D. Ill.  2006); *see also Amakua Development LLC v.  Warner*, 2007 WL 2028186, at *11 (N.D. Ill. July 10, 2007).

Indeed, there exists a fine line between permissible expert testimony in cases such as this one.  While Henderson may not opine about whether Defendants breached applicable duties nor apply the law to the specific actions they took in this case, he may explain the general background against which the conduct of boards of directors are measured.  *See, e.g.,* Henderson Rep., at Section III.  That is, he may testify about Defendants' conduct in light of industry practices and standards.  Here, he offers his analysis of the practices and standards of corporate governance and Defendants' conduct in light of those practices and standards.

There exists sufficient general information regarding the conduct of boards of directors to allow him to testify.  *See, e.g.,* Henderson Rep., at Section III.  For example, Henderson sets forth the basic obligations of directors in general, explaining the three hallmarks of lawful and effective corporate governance; the purposes and requirements of the procedural and substantive duties of directors; the requirements of state fiduciary duty law; and how these principles serve as the rubric under which courts analyze corporate decision making.  *Id.*  at 6-7.  Henderson also explains the same rules of corporate governance apply to companies of all sizes, and in turn to all directors.  *Id.*  at 8.  He then describes in detail the general duties of

directors and shareholders: the duty of care, duty of loyalty, duty of good faith, and *Revlon* duties. *Id.* at 10-29. Against that backdrop of general principles, he goes on to explain what happens when fiduciary duties are breached in terms of the type of judicial review to which such conduct is subject. *Id.* at 29-31. Finally, he also details the special case of fiduciary duties in venture-backed companies, explaining that although exactly the same duties apply to board members of venture capital-backed startup firms as apply to all other corporations, the venture capitalist must be especially sensitive to the potential for conflicts of interest because he also has fiduciary duties as a director to serve and promote the portfolio company's best interests. *Id.* at 31-35. In this context, he sets out the general advice of practitioners on how to avoid liability. *Id.* at 33-34. More specifically, he explains compliance with certain affirmative steps is recommended in order to fulfill one's fiduciary duties as a director. *Id.*

To the extent Defendant's expert Kyle can lay out the context of the environment in which the Cadant Board operated at the relevant time (as expressed above), Plaintiff's expert Henderson can also so testify. For example, Henderson may provide a backdrop against which the jury may view this case in that he can describe how boards of directors operate; the types of alternatives available to the Cadant Board; and factors a board can and should consider. However, Henderson cannot judge what the Defendants did or did not do; nor whether they violated the law.

While Defendants argue Henderson's deposition confirms his report is only a legal opinion, this Court disagrees, noting Defendants' counsel repeatedly asked him during his deposition for his opinion about legal issues and few questions about his experience in the area

of corporate governance. Henderson testifies on an array of matters that would enlighten the jury regarding corporate governance and related principles. For example, he explains what it means to be a "start up" company; how firms similar to Cadant are subject to additional scrutiny targeted to limit self-dealing; the standard practice in the industry for lawyers who advise venture capitalists to avoid conflicts of interest; very specific steps boards generally follow; the standard practices for firms like Cadant to follow in venture capital cases, and the standard procedure followed by corporate boards; descriptions (not legal opinions or legal conclusions) of what procedures were followed (or not followed) in this case; and the purposes and advantages of obtaining a fairness opinion. *See, e.g.,* Ex. C to Def. Memorandum, at 25-26; 27; 31-32; 33; 34; 35; 36; 37; 40; 44; 51; 53; 54; 60; 62; 64-65; 67-72; 77-78; and 91.

Henderson's testimony will offer useful background information and help the jury to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702; *United States v. Mansoori*, 304 F.3d 635, 654 (7th Cir. 2002). For example, in *Cary Oil Co.*, the court allowed plaintiff's expert, a law professor, to explain the concept of veil piercing as well as general corporate governance principles because such background information was "crucial if the laymen jury is to understand fully the complex issues." 2003 WL 1878246, at *5.

Cases in which courts preclude experts from applying legal standards to the facts of a case and from opining on whether defendants' conduct breached or violated legal standards are distinguishable. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (affirming exclusion of law professor's testimony about "purely legal matters and made up solely of legal conclusions, such as conclusions that the city's actions

violated the [Fair Housing Amendments Act]"); *Sinclair,* 74 F.3d at 757 n.1 (affirming exclusion of expert testimony on whether insurance program and a contractual relationship violated governing law); *Klaczak*, 2005 WL 1564981, at \*4, \*9 (excluding expert testimony that defendants had "violated the Anti-Kickback Statute, or met (or did not meet) with the safe harbor strictures, or whether any discounts received were illegal remunerations").

Defendants argue courts have precluded experts from testifying on the very same issues Henderson addresses in Section IV of his Report: whether, and to what extent, defendants purportedly breached their fiduciary duties. *Askanase v. Fatjo*, 130 F.3d 657 (5th Cir. 1997). To this end, Defendants argue *Askanase* is instructive, as in that case, the Fifth Circuit applied these principles in evaluating the testimony of an expert seeking to opine on whether defendants' conduct measured up to fiduciary duty law standards. *Id.* In *Askanase*, a lawyer expert for a trustee in bankruptcy sought to testify whether the company's directors had "fulfilled their fiduciary duties to the Company, its creditors, and shareholders," and, if they did not, then "how and to what extent did [they] breach their fiduciary duties." *Id.* at 673. The Fifth Circuit ruled "[s]uch testimony is a legal opinion and inadmissible," reasoning that "[w]hether the officers and directors breached their fiduciary duties is an issue for the trier of fact to decide. It is not for [an expert] to tell the trier of fact what to decide." *Id.*

Henderson will not be permitted to offer legal opinions nor legal conclusions as part of his testimony. Excluding such portions of his testimony is consistent with case law in this Circuit. *Panter*, 646 F.2d at 293-95. After all, a court has broad discretion in assessing expert testimony and should only exclude those portions which it deems impermissible. *Olympia*

*Express, Inc. v. Linee Aeree Italiane S.P.A.,* 2006 WL 293883, at *6 (N.D. Ill. Feb. 3, 2006); *Richman*, *supra* at 949. For example, in Sections IV and V of his Report, Henderson applies his interpretation of Maryland and Delaware fiduciary duty standards to his understanding of the facts. Ex. C, Henderson Rep., at 35-92. This is inadmissible. As discussed above, it is for the judge—not the expert—to instruct on the governing legal standards, and it is for the jury—not the expert—to determine the ultimate legal issue of whether Defendants breached or violated those standards.

In sum, Henderson calls upon his training, education and practical experience as a basis upon which to provide a helpful explanation to the jury regarding the standard practices and procedures of corporate governance, standards of conduct applicable to directors and officers and other additional background information. Such testimony is proper and will assist the jury in resolving the ultimate factual issues in the case. Thus, Defendants' motion *in limine* number eleven is denied

## V. CONCLUSION

For the reasons set forth in this opinion, Plaintiff's sixth motion *in limine* and Defendants' eleventh motion *in limine* are denied, subject to the limitations set forth in this opinion.

SO ORDERED THIS 23rd DAY OF JULY, 2009.

_Morton Denlow_
_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**


James A.  McGurk
Law Offices of James A.  McGurk, P.C.
140 South Dearborn Street, Suite 404
Chicago, IL 60603

Hugh G.  McGreen
Brian Hogan
McBreen & Kopko
20 North Wacker Driver, Suite 2520
Chicago, IL 60606

Richard C.  Leng
Law Offices of Richard C.  Leng
330 West Main Street
Barrington, IL 60010


Counsel for Plaintiff

Thomas O.  Kuhns
Thomas A.  Tozer
Matthew T.  Regan
Gabor Balassa
Melissa K.  Grouzard
Kirkland and Ellis LLP
300 North LaSalle
Chicago, IL 60654

David A.  Rammelt
Dawn M.  Beery
James M.  Reiland
Kelley Drye & Warren LLP
333 West Wacker Drive, Suite 2600
Chicago, IL 60601


Counsel for Defendants